May it please the court, I'm Robert Jobe and I'm appearing today on behalf of the petitioner Anjom Khan. Now let me ask you the same thing, it's not so much that your voices are so soft, it's that the projection behind you with the microphones doesn't work very well, so make sure to keep your voice up. Again, I'm Robert Jobe and I'm appearing today on behalf of the petitioner Anjom Khan. It seems to me that whether the U.S. military's activities in Iraq and Afghanistan constitute terrorist activities turns on the question of whether they are unlawful under the laws of the place where they were committed. And I don't think it's as simple as referring to Iraqi law or Afghan law. Because what we're dealing with in Iraq and Afghanistan is an international armed conflict and normally when you're dealing with an international armed conflict, soldiers from the United States would not be subject to Iraqi law. They're going to be subject to international law. They're going to be subject to the Geneva Conventions. And it seems to me when the statute's talking about... But the Geneva Conventions, if it is a declared war, right? No. That's not what the Geneva Conventions say. The Geneva Conventions apply irrespective of whether one of the parties refuses to acknowledge that there's a state of war. So any commencement of hostilities is sufficient to invoke the protections of the Convention? Between two states, yes. What about the Taliban in Afghanistan? Well, that also involved an invasion against Afghanistan itself. And so that clearly was a conflict between two states. The Taliban was part of that, but clearly that was an international armed conflict as well and the Geneva Conventions applied. But the point is that... What if we invade Pakistan in order to go after Osama bin Laden? Well, then you're going to get into a situation of whether there was consent by the Pakistani authorities, whether the Pakistani authorities took part. But it would seem at first blush... And this is the kind of thing I think you'd have to have experts argue out in immigration court. Whether this is in fact an international armed conflict would be a question of fact, really, for expert witnesses to weigh in on. But it seems to me in that situation it would prima facie be, yes, an international armed conflict. And again, I think in that kind of situation, the law that governs, it's not going to be subject to Iraqi law. They're going to be subject to international law. And the issue, consistent with the Refugee Convention and the protocol, is not whether they were a combatant. The issue is whether or not they committed a war crime, crime against peace, etc. What do we do with the related but perhaps not identical question of not international conflicts, but conflicts within a country? Right. And that's harder. See, before I get to that, I do want to say, I think that the threshold position in this case, and it's a question that the judge never answered, is what kind of conflict are we dealing with here? Because here we're in Kashmir. We're in Kashmir. And Kashmir is a disputed territory. And if you look, from the very beginning, Mr. Khan and his attorney argued that this was an international armed conflict and that he was not subject to Indian law. And this is set forth on page 216, where he maintained, quote, India has no legal authority over Kashmir. And he emphasized that the UN Security Council has determined that the legal status of Kashmir must be decided by a plebiscite. He emphasized that, I think it's three times, the UN Security Council has said it does not recognize Indian sovereignty over Kashmir and that the question of Kashmir has to be decided by a plebiscite. And the immigration judge declined to answer this question. She didn't want to go down that path. And if you look at her decision, and this is on page 199 of the record, the very first sentence in her decision is that he's a native of India with disputed citizenship. She steered away from answering the question of whether he's Kashmiri as he maintained, or Indian. But that just begs the question again, is this the example that you're talking about? The United States entering an independent country like Iraq? That is, is India occupying an independent country, Kashmir? And is Pakistan occupying unlawfully an independent country, Kashmir? Because if it is, then again, domestic law, it seems to me, would be displaced and the real question would be, are the activities, these combatant activities, lawful under international law? Are they lawful under the Geneva Conventions and the protocols that go with them? And see, at that point, again, the immigration judge declined to answer the question in her decision here about whether or not the JKLF was engaging in attacks against civilians. She set her decision up basically to frame this question. She says that terrorist activities in this context, even attacks against military targets, purely military targets would qualify as terrorist activity. Well, that's true, possibly. It's not true if this is in fact an international armed conflict and domestic law is displaced by the Geneva Conventions and the other international law of humanitarian law of armed conflict. She needed to answer that question. She didn't answer that question. That's why I think the whole case has to go back because it seems to me that that's a threshold question that you need to decide before you can determine are the actions of the JKLF in attacking military targets lawful or unlawful? Now, your question about whether what happens in a non-international armed conflict, that's much harder because generally in a non-international armed conflict, at least as I understand it, there isn't a combatant's privilege and as I understand it, there's common Article 3 to the four Geneva Conventions and that applies to a non-international armed conflict and that describes what a war crime is. And so I guess our position would be if this is a non-international armed conflict, still the conflict has to be regarded as lawful or not unlawful if it doesn't violate Article 3 because Article 3 sets forth what constitutes a war crime in a non-international armed conflict. And that would be consistent with the Refugee Convention and Protocol. And as we argue in our brief, you have to try to interpret this provision if possible so that it's consistent with the Refugee Convention and Protocol. And the Refugee Convention and Protocol say that combatants are not per se ineligible. What it says is that you're precluded from refugee status and protection on a convention if you committed a crime against peace, a war crime, or a crime against humanity. Again, the focus is on whether it's a war crime. How stable is the definition of international armed conflict? I mean, I basically understand the situation in Kashmir. The lines have been drawn as they've been drawn ever since partition. That territory has been... It's a ceasefire line. It's not a border. That line has been in dispute ever since. It's been a subject of debate between India and Pakistan and the people living in that area ever since. Is that an international armed conflict and why? I mean, where are you getting your definition of international armed conflict? As I looked at it, I mean, it seemed to me there are a couple different reasons it should be characterized as an international armed conflict. But for starters, the convention, it says, shall apply to all cases of which may arise between two or more of the high contracting parties, even if the state of war is not recognized by one of them. So it doesn't need to be a declared war. It's just a question of... Pardon me, your honor? Yeah, that is set forth... I will get you the page site on that because it is in the record. And then it goes on to say, and this is in the Article 2, Common to the Four Geneva Conventions, it goes on to say that the conventions also apply to all cases of partial or total occupation of a high contracting party, even if the said occupation meets with no armed resistance. So, I mean, even assuming that the Maharaja somehow lawfully acceded Kashmir to the Indian government, the fact remains that one-third of Kashmir is occupied by Pakistan. That alone makes it an international armed conflict. And the fact that they fought two wars over it since 1947 would suggest we have an international dimension. And it seems to me that you can't decide whether or not... I mean, this is not a question that you need to decide. This is a question that I think the immigration judge needed to decide in the first instance. Because you can't decide whether the conduct of the JKLF is lawful or unlawful until we dispose of this threshold question. And it's not a question that the Court of Appeals should be deciding in the first instance. The immigration judge avoided it. She did so intentionally. And I think that's a flaw. Otherwise, we're in the position of... this case arguably is analogous to the one that Judge Nelson was raising about the United States entering Iraq. And is that terrorist activity or not? This would be an analogous situation. We want to avoid that. The immigration judge has to answer that threshold question. I want to go to one other issue while I have my time here. And that is, if you go to page 206 of the immigration judge's decision, down toward the bottom there, she says... 206 of the administrative record. This is in the immigration judge's first decision. And I want to walk through both decisions. But she says, quote, the respondent credibly testified that he believed there to have always been two separate JKLFs. So she accepted his testimony as truth. He believed that there were two JKLFs. But she never asked or never answered the question of whether his belief was a reasonable one. And I think that's a huge mistake. And I think it alters her conclusion that he's subject to the bar. Because then she goes on to say... I read that to be that there were two components or factions, if you will, but that they were one and the same in terms of... That's how she read it, wasn't it? That's definitely not the way I read it. I don't understand her to be saying that. I understand her to be recognizing that he said some inconsistent things in his testimony. At one point he said they're two wings of the same organization. But ultimately, he emphasized throughout, and if you look at the transcript, he emphasized throughout that these are two separate organizations. He does go on to say that DHS put forth... I'm looking at 207 now. DHS put forth evidence that prior to Malik taking over in 94, there was one JKLF, and it included killings, bombings, and attacking convoys. And then she goes on to say, while Respondent testified that he believed there to have always been two separate groups, he did not submit any documentary evidence to substantiate that. So why doesn't that constitute... Why doesn't that constitute a failure of Petitioner to meet his burden of proof? She did say he failed to meet his burden of proof in showing that there were two separate organizations. But that doesn't answer the question of whether his belief that there were two organizations was a reasonable one. She goes on to say in that same paragraph that the evidence that he did submit clearly shows that prior to 94, violent acts were being committed by the JKLF. So that begs the question, did he believe that there were two JKLFs or one? And was his belief reasonable? She says in that paragraph he didn't submit any evidence to answer that question. So why should we remand it back based on his failure to meet his burden of proof? Because that's where I'm having a hard time following. I agree that she ultimately concluded that he failed to prove that there were two separate organizations. But my point goes to the exception here. Because ultimately the exception, even if he solicited funds for a terrorist organization, he's not barred if he can demonstrate by clear and convincing evidence that he did not know and should not reasonably have known under the old statute, it was that the organization was the solicitation would further that organization's terrorist violence. And my point is. I mean, look at the following paragraph on 207 where she concludes ultimately because he holds the burden of proof and because the evidence on both sides appears credible and strong, this Court cannot find that Respondent has met his burden of proof that there's always been a nonviolent and a violent component and that it was not a terrorist organization. I'm not contesting that. That's not my point. I agree with that. He failed to meet his burden of proof on that question. Okay. The question is, was his belief that there were two organizations reasonable? If she – if his belief was reasonable that there were two separate organizations If she came to her conclusion that he didn't meet the burden of proof, that he didn't convince her that his belief was sincere and reasonable. Because you're not barred under the statute if you can show that you did not – should not reasonably have known under the first statute that your solicitation would further the organization's terrorist violence. But that's what he has the burden of proof to show, and she says he didn't meet it. Right. But she says he didn't meet it without ever considering the question about whether his belief that there were two organizations was reasonable. But I have to assume that she wasn't reading the statute when she said he didn't meet his burden of proof under it, and that doesn't make any sense. No, you don't. She missed a step in her analysis. She ultimately said – she said you failed to prove that the JKLF was in fact two organizations. And so you should have known, therefore, that you knew that this one JKLF was engaging in violence, and so you should have known that your solicitations were going to further that terrorist violence. But that doesn't make any sense if his belief that there were two JKLFs is a reasonable one. That's a threshold question. If he believed reasonably that there were two JKLFs, then it's impossible for her to conclude that he should have reasonably known that his solicitations were going to further terrorist violence because he thought there were two organizations. The issue is was that belief, which she credits, was that belief a reasonable one or not? If it was reasonable, it necessarily follows that he falls within the scope of this exception. But she didn't answer that question. She focused on the question of whether he failed to prove that there were two JKLFs. Okay, he failed to prove that, but that doesn't answer the question of whether his belief that there were two JKLFs is reasonable. I hear your argument, but this is just one judge speaking. In light of how she ruled, I just don't think you can parse it that far. All right. I'll reserve my remaining three seconds, and I'm just grateful that you're one judge out of three. Okay. Now let's hear from the government. I'm going to make sure I'm remembering the state of play here. So we've heard Mr. Ahmad and the government in response. I didn't yet get a chance to Mr. Ahmad to rebut. Is that correct? Did you not rebut? Why don't we hear the government on this case, and then you may have things to say in response. I've deliberately held back your rebuttal. We'll give each of you a minute or two in rebuttal, you, Mr. Ahmad, and you, Mr. Job. Okay. Thank you, Your Honor. May it please the Court, Jeffrey L. Mencken, United States Department of Justice for the Attorney General. I think there's a concession in counsel's presentation that I think is notable and perhaps determinative, and that is that Mr. Khan said that he knew as early as 1989 that the JKLF was attacking Indian convoys. So he knows about this. So his what he knew or reasonably should have known, that basically ends the question because it's his burden of proof to show that he didn't know, and he testified that he did. He also testified that whether there was one wing or two wings, and he went back and forth on that depending on what he was trying, what point he was trying to make. But there's no evidence that says that prior to 1994, when there was a split that is reflected in the record, that the JKLF did not engage in terrorist activities. And he himself testified that if there were two wings, and there were two wings, I imagine, and the judge mentioned them, that they were two parts of the same organization with the same goal of armed conflict. So I think we're done on that point. It was Mr. Khan's burden of proof throughout on every point of law. And if there's a tie, he loses. If he says two conflicting things, he loses. They were always two parts and they were never together, but the evidence doesn't support that. So there's really not much to go over here. And he admitted soliciting money for this organization for six years. What do you do with the argument that this is not a civil war, but rather an armed international conflict, an international armed conflict, and therefore legal, according to the laws in which the country takes place, take on a different meaning? Mr. Jobe's answer was clearly an answer that was available to you when we asked you about the invasion of Iraq, and you chose not to give it. Why didn't you give it? And I regret that. Oh, would you like to give it now? Let's carry on. But you see, if you give that answer now, we may have to send it back, as Mr. Jobe suggests, in this case. Do you follow me? I'm not certain I do, Your Honor. I apologize. Mr. Jobe's argument is that putting to one side a civil war, which is what I think we've got in the first case, let's take another case where we have an international armed conflict, and the army of one of the parties is now in the territory of the other and is doing things that are in violation of the law of that other country. Mr. Jobe says, well, that's not illegal within the meaning of the statute because we're talking about an armed international conflict, and illegal in terms of the statute doesn't apply to that. Do you follow that argument? Yes. And would that then be your argument as to why the United States and Iraq is not engaged in terrorism under the statute? I think that goes a long way to answering that question, yes. Okay. If that's so, why is this case not why does this case of Kashmir not follow under that line of analysis? Well, let's look at the conduct that was identified. You have bombing of railroad stations. You have kidnapping of political figures. You have murder of political figures. I don't think that any of these come within any conceivable exception of laws of war to the extent that that has anything to do with what we're talking about. I think taking this into the international law realm is a rabbit hole, and it takes us off of what is really at stake here. And what is really on the record here. And that is the evidence that, for example, the State Department in 1989 acknowledges JKLF as one of, quote, two major terrorist organizations, close quote, operating in Kashmir. We know what the activity was. We know, as I said, kidnapping, kidnapping. A fellow that Mr. Khan acknowledged knowing was blown up by a grenade that he was throwing at police. And that's at the record at 276 and 459. He admits that they're attacking Indian Army convoys, and he's known about this since his formal inception. The burden here is on Mr. Khan, and no record evidence contradicts the finding that these activities that were identified meet the statute. To the extent that we're talking about the 67 protocol and the 51 convention, again, those are not controlling. I think we laid our rationale out in detail in our brief. To the extent that they don't control, and even if they do control by their own terms, they leave to the Congress or to the United States to define the immigration laws and who gets to come here and who gets to stay here. Is it significant that Khan describes himself in his testimony before the immigration judge as one of the brains behind the New Deal? It's significant for a couple reasons. When he's trying to gain asylum or withholding, and I should point out he was granted deferral, as was Mr. Abdu, he's the brains and he's the behind-the-scenes guy. When he's presented with evidence that would render him ineligible for these, he doesn't know what's going on. Suddenly, the brain goes blank. He knows what's going on. He says he knows what's going on. At a very minimum, he acknowledges the attacks on the convoys. He waffles and flagellates as to whether he knew about landmines and the blowing up of the train station and, oh, the group that kidnapped the home minister's daughter may not have actually been. I didn't think they were part of JKLF, even if they did think they were. That's a failure of proof. So let me pursue this line about I don't ask you to concede, but for the purpose of the question, let's assume that this is an international armed conflict in Kashmir. Are you saying that in that circumstance, that nonetheless he's engaged in terrorist activity, and if you're saying that, why? I think accepting that for purposes of argument, that scenario, I would say that it would be, and it would be. It would be terrorist activity? I believe so. Because? Because, as I said, Your Honor, we're not talking about military organizations confronting each other in the way that we understand it to be. We're talking about acts of blowing up train stations. We're talking about deaths of civilians. We're talking about kidnappings. Okay. Now, tie that answer to the statute. In what respect is that now illegal activity? Or are you saying that it's legal activity, but nonetheless terrorist activity? I mean, tie me back to the statute with that analysis. Well, it's certainly the use of firearms and use of weapons and things of that sort. If you're talking about the legality of that activity, I think certainly it is a close question in that I don't believe that any law of war recognizes assassination of politicians or kidnappings of family members of politicians to be acceptable conduct in any situation. So that argument then would be that we're now looking not at the laws of the country in which this is taking place, but rather law of war, which is assumed to apply? I don't think it's necessary to go into that realm, but since we're there, yes. I would point out that they certainly were illegal under Indian law, and Mr. Malik did, in fact, serve time under Indian law. And the United States government recognizes the government of India, and I think the largest democracy on the planet is entitled to enforce its laws, and I'm not going to say that we shouldn't acknowledge that. I think the statute, again, broadly but permissibly, encompasses the activities that were identified on this record. If we wish to have an academic discussion, as appropriate as that might seem, we can do that. But let's come home and let's look at what was decided based on this record. And there's no assertion of compelling record evidence that requires a reversal here. And to the extent that I understand why counsel wishes to do it, but we don't need to go there. The statute covers it. Congress wrote it that way. The Board has interpreted it that way. And even this Court has said, there's no need to look at the motives of the person committing these acts. So, again, unless there are further questions, even if Mr. Bell, I would take that up, I'll take that back and rest unless there are questions from the Court. Any further questions? Thank you, Your Honor. Let me, why don't we begin with Mr. Ahmad and then Mr. Job. Yeah. I apologize if we're doing a slightly unconventional order, but I thought it might be useful given the common ground between the two cases. Yes, Your Honor. Your Honor, I just want to point to what Judge Nelson said earlier about the reasonableness of the Petitioner's support to the OLF. I believe Judge Posner in the Hussain case, the government cited in their 28-J letter, also looked at factors such as the person, I mean, the alien in Hussain being a high-level member of the MQMH organization in the reasonableness analysis. Because, obviously, if the Petitioner is able to establish that he did not know or that the organization OLF was a terrorist organization under new law, and under the old law, it was if he did not know or should not reasonably have known that his support to the OLF would provide, I mean, would be used for military or terrorist purposes. What do we do when he's not inadmissible? What do we do with your client's admission that he knew that the funds that he was raising were being given to the organization for whatever use it wished to put them? Your Honor, I believe that under the definition today, I would say that would be terrorist activity, if the organization is terrorist. And that's what Judge Posner said in the Seventh Circuit decision, that oftentimes terrorist organizations may use especially monetary funds to terrorist activity. However, in this case, there's no evidence that he knew that OLF was even engaged in terrorist activity as defined under the common meaning of the term. If there's any. . . Okay. Thank you, Your Honor. Thank you. Mr. Job? First, I'm troubled by the government's repeated references to JKLF attacks against civilians. There's some evidence in the record to support that. But the judge didn't make any such finding. She avoided making a finding about whether the JKLF was, in fact, responsible for those attacks because it was a matter of dispute. What's your answer to my question to counsel about the significance of your client's admission that he was one of those terrorists? That he was one of the brains behind the JKLF? Well, as I understand it, the judge. . . I'm trying to say as true as I can to her decision. As I understand her decision, it focuses exclusively on solicitation. So the fact that he's the brains, that might go to the material support issue. Going back to his burden of proof to show that he could not reasonably have known that the organization was engaged in terrorist activities, isn't it significant that he admits to being one of the brains behind the organization, which would tend to undercut his denial? I actually think it helps us. I think it cuts the other way. It cuts the other way? Yeah. I mean, he's a brain. He was very involved in the organization, and he believed throughout that there were two separate organizations. He was intimately involved with this organization. I think it cuts the other way. But on that question about whether or not his belief that there were two separate organizations is reasonable, that's one that the judge has to make in the first instance. And she didn't make it. But it is critical to the resolution of this case. The only other point I want to make goes to this burden of proof question, because the judge basically said if the evidence indicates that one of the bars may apply, the burden shifts to, you know, Mr. Khan. And she cited a regulation that's general to applications for relief, but there are two other regulations that are particular to asylum and withholding, and they don't use the may apply language. They suggest that there has to be a prima facie case. And that's 1208.13c, which says if the evidence indicates that one of the above grounds apply, not may apply, but apply to the applicant, he shall have the burden of proving by preponderance of the evidence, blah, blah, blah, blah. There's a similar regulation for asylum. So what you're arguing now is that the government didn't even establish a prima facie case? I'm suggesting the judge applied, shifted the burden based on a regulation that doesn't apply to this case. Is your position that the evidence in this record as to Khan is not sufficient to establish a prima facie case? Yes. That's that the burden shifts? Yes. Okay. And my authority for that is also this Court's unmarked decision in Maharaj, which interpreted those regulations as requiring not that a ground may apply, but a prima facie case. One last question. It's a practical one. At the moment, your client has deferral of removal under the Convention Against Torture. And basically, if you end up prevailing, he would get withholding of removal. What's the practical difference between those two things? He'll get deferral of removal. Deferral of removal. And the biggest difference is deferral of removal is the least stable immigration remedy available, because basically he has deferral of removal now. It's a very temporary remedy.  notwithstanding the finding that there's a likelihood that he'll be tortured. Withholding doesn't have anything like that. And the regulations preclude any judicial review of the government's determination that these diplomatic assurances from the government of India are believable. That's a huge one. The other is that deferral of removal proceedings can be reopened at any time. And the government can come in at any time and ask to have the deferral rescinded. Has your experience, Mr. Job, as counsel for the government, represented that as long as these folks don't commit criminal acts, that they basically leave them alone? Nobody's looking for them? No. That's not at all true. That's not my experience. Actually, they're normally released under orders of supervision. They have to report at least once a year, oftentimes once a month, or sometimes even more frequent than that. I guess my question was, do they then initiate removal proceedings at some point down the road? Have you had that happen? They can. I have that happen only in one case, yeah. Okay. Thank you. Thank you. Two difficult cases. Both now submitted. Abdu versus McKasey. Congress McKasey. Thank counsel for their very useful arguments. That concludes the arguments at this point. Judge Nelson, is it acceptable to you that we will do our conference on these cases not this afternoon, but rather tomorrow afternoon? Yes, it is acceptable. Yes, thank you. So that will make life a little smoother here, too. What we anticipate doing then is questions are now adjourned, but we won't have to take a break for conference, which means that we're quite willing to stay after and answer questions by students. Yes, I will miss the questions of the students, and I'm sorry for that. But we will confer tomorrow, and that's perfectly acceptable. Thank you. Thank you, Judge Nelson. Now, do you need to take a break? No, I'm fine. We are now adjourned, and we're now in, I don't know what to call it, question and answer mode. Anyone who wants to ask us any questions, you can ask us anything you want, and if we think it's something we don't want to answer, we'll behave like the lawyers and not answer it. That was purely a hypothetical comment. Not applicable to the lawyers here in front of us. Okay. We're getting some space aliens here. Taking care of, Kwame? Okay, thank you. Sorry, start again, Patrick. During the airline case, one of your questions went to what the actual consequences were for whether it went to arbitration or the district court. I mean, that sort of question came up again during the asylum cases. And I was just curious what you thought the advocates, what their role was, whether they should just be sort of ready to answer your questions, or whether those types of consequences were the sort of thing they should put forward in their case. Hmm. I don't have a very clear or categorical answer to that one. I don't fault the advocates at all for not saying one way or the other, nor would I really have faulted them for saying, listen, practically speaking, this is what's at stake for my client. It's not legally sort of where the case lies, but as a practical matter, here's what's going to happen. I think that, to my mind, that was pretty much a six of one, half a dozen of the other for the lawyer to decide to do. I like to know what the practical consequences are, because as an appellate judge, we are supposed to be resolving these cases, and we're making law for the circuit. And in doing so, we're affecting cases and factual settings that are not presented to us in the case that we just ruled on. And I want to make sure I have a handle on what the practical consequences are going to be in this case, so that as I'm drafting the opinion, I can draft it in a way that will give the parties in this case the answer that they look for, but not wreak havoc in the next case that's going to come along that I wasn't thinking about when I wrote the opinion. I agree with that. Everything was so – yeah. There you go. Yeah, sure. It can make a difference. I can't give you a percentage. And as I hope you could tell from our approach this morning, we come pretty well prepared to these arguments. We've read the briefs. We've had our law clerks perform a substantial amount of research in both the record and the cases that the parties are relying on. We spend – and I know I speak for Judge Fletcher, because he prepares the same way I do. You know, we read the key cases. We read the key portions of the record. And by the time you get done, we're pretty hot in terms of ready to roll on the particular case. But even despite our best preparation efforts, there are still nuances in the case that we miss. And it's very helpful sometimes to have the benefit of oral argument to make sure that we understand what the issues are and what the parties' positions are on the issues. I'll elaborate, but consistently with what Judge Tolman just said, it's a rare case that I come on the bench thinking one thing and walk off the bench thinking another. It does happen, but not very often. And it'll usually happen because there was something about the case that I just didn't understand. There was a key fact that I missed, maybe a key fact that was buried in a footnote or not quite mentioned in the briefs. It happens, but not very often. More often, the utility of the argument, if it's going to change the way we approach the case, will be in the nuance. How is the opinion going to be written and so on? For example, we will often submit cases without hearing argument. We say, listen, we know the answer. We don't have to have the argument. But sometimes it happens that I know what the answer's going to be, and I don't have to hear argument to know the plaintiff's going to win. But there's going to be an opinion written. And I much prefer to have argument in a case where there's going to be an opinion written, even though I know for sure what the answer has to be, because it'll help a little bit in how the opinion's going to be written, or at least potentially so. And finally, one last thing about usefulness of oral argument. I don't know if the lawyers like to hear this. Even in the cases where it makes no difference whatsoever, that is to say, it doesn't change my mind, doesn't give me additional nuance, nothing. It has an enormously important function for us, because it makes us, all three of us, prepare at the same time, and then discuss the case when we are all prepared. If you don't have that sort of disciplining, it is showtime. You know, okay, I'm prepared on Monday and I write a memo. Well, Judge X reads the memo on Monday afternoon, but he's got something else he's going to do, so he doesn't really get back to it on Wednesday. The idea of having all three of us highly prepared, ready to discuss, ready to decide, at the same time is a very useful thing. And that's kind of the lawyer's argument. They're just the vehicle for that event. I agree with what Judge Fletcher said, but he and I have a difference of opinion as to submitting cases on the briefs. I view the submission of cases on the briefs as part of an essential triage function in the way that we process the 16,000 cases that we have pending before us on appeal. And we are overworked and understaffed. And underpaid. And underpaid. I will add that. I'll add that as well. And some of these cases, and you heard some good ones this morning, are so hard that I would like to spend as much time as I can preparing for those cases. And I don't want to have to spend a lot of time on cases where the answer is obvious and we're going to be able to dispose of it very quickly. But if we don't submit that case on the briefs, then I have to put extra time in in order to prepare for oral argument, because I think the parties are entitled, if they're going to argue the case, to having me as absolutely well prepared as I possibly can be. And if I have to spend more time on those kinds of cases, that means I have less time on the harder cases. And I'd rather have more time on the harder cases. I mean, that's somewhat related, but I'm curious to hear your thoughts on the hopefulness of oral arguments, particularly immigration cases. It depends. These two cases are very uncharacteristic cases because they involve a fundamental question of statutory definition in a difficult area of the law, whereas you could hear the statute is written in very broad terms and to some degree counterintuitive terms. And we had very good lawyers in front of us. And I thought the briefs were useful, and to an unusual degree I thought the arguments were useful. Now, that's not typical in immigration cases. Most immigration cases, even the ones that we hear arguments for, are much more straightforward. It will be basically some guy comes in, tells us a story, the immigration judge thought it was probably untrue, enters in an adverse credibility finding, and we're being asked was that sufficiently supported. And it requires us to read the record. We hear the argument. Usually I'm very disappointed in the quality of the argument. Usually I'm disappointed in the quality of the argument from the government too because in those cases they send out from Washington, D.C., somebody who's been working for a year and a half and it's sort of their training. I don't begrudge the government doing the training. But the run of the mail immigration case is quite unlike the two that you just heard. I don't really have anything to add. Pam? One of the things that interests me is, you know, the Sixth Circuit having oral arguments in particular is one of those cases. The Second Circuit without a camera set up and the judges doing the video conferencing and the jury out of the home. What do you think the effects of these sort of not all of you in the same place are going to be on the line? What effects do you think that has either on the oral arguments themselves or on the way they're being presented? Personally, I am not bothered by the increasing use of technology in order to make our operations more efficient. I don't think there's a significant difference in the manner in which we conduct the arguments or confer with one another. That is a subject of some debate among the judges on our court. There are some judges who absolutely hate doing anything other than having live in-person arguments with all three judges being present. But, you know, things happen in life. Judge Nelson couldn't be here because she's dealing with a family medical problem. And, you know, you've got to make accommodations for those sorts of things. Our circuit is so big that it is frequently very expensive for counsel to have to bill clients to travel for a day or two to get to Seattle or San Francisco or wherever they're coming from. And there are instances where I think using technology benefits everybody. And I don't think it makes an appreciable difference in the quality of the argument. I agree with Judge Tallman that we use the technology to try to make life easier, sometimes for the lawyers as well as for us. We allow telephone argument, particularly in small-dollar cases where somebody might have to come all the way from, I don't know, Billings, Montana, to argue a Social Security case. The money at stake is not that much. The lawyer is not going to make any money. If the lawyer says, really, I would like to argue this. Can I do it by telephone? Our answer is, assuming we're not going to submit it, which we sometimes do. But if the lawyer says, can I do it by telephone? Our answer is yes. And they're saying, you know, can I do it by video? You go down to the courthouse in Billings and you can do it by video. We're happy to do that. What do I think of the arguments that are conducted this way? Usually I don't think it makes a difference. Occasionally you'll have a technological glitch. And you could sense it just a little bit today with the telephone that Judge Nelson had a little trouble making herself heard when she wanted to interrupt to ask a question. But I don't think it made any real difference in the end. It's just a little bit of awkwardness that you deal with. Question? In the nochow of behind the scenes, did you understand that the students that have gone through the training, the interns, are fulfilling an enormous need because of the lack of teachers that are available, as well as sometimes being even better teachers than the teachers that have been there for 40 years and who are able to inspire these students? It wasn't quite brought up, but I just wanted to interject. Let me say this, if I can. I've had three girls go through my – our three girls went through the Berkeley Public High School system, through the Berkeley Public Schools. I know quite a bit about education from having lived up close. I try to keep that out of what I know for the purpose of the case. It's a different proposition. And it's clear that the lawyers are trying to educate us to what works and doesn't work. And to a degree it's relevant if we're trying to figure out, okay, well, why is the Secretary of Education trying to do this? And any good Anglo-American judge in the common law tradition tries to keep open as part of the deliberation, well, this is what the words of the statute say, but this is so unworkable. Is there any way to salvage the statute? But in the end, we're limited to what's in the record. This record actually is pretty big. They've got lots of stuff in there. And you try to keep out your own personal views. You can't fully, and maybe you shouldn't fully. So I want to say as to how good these teachers are and so on, and how skillful they are and so on, what I will do as I decide this case, and I'm sure Judge Tom's going to do the same thing, there's some reports in the record dealing with new teachers, credentialed teachers, the effect of the credentialing. For example, there's a report in there where the Secretary of Education makes it very clear, her, who is the then-Secretary, her skepticism about the effectiveness of certain credentialing programs. But I'm afraid the short answer is thank you very much, I'm sticking to the record. Because that's what my job is. And I agree with that completely. I do think, though, that one of the advantages of having a bench that is made up of people who come from all walks of the legal profession is the fact that you bring the experience to bear that you learned from what you did before you became a judge. And it does inform the way that you look at cases. I feel a lot more comfortable in certain kinds of cases simply because I had experience in those areas before I became a judge. But I agree with Judge Fletcher. We walk a very fine line in terms of having to confine our decision to the record that is before us and the law that applies to it without allowing any biases or prejudices that we may bring from our prior experience or sort of knowing how things work. It's a little bit like saying we want the jury to come in and bring their common sense and their experiences, but we don't want them to decide whether the defendant is guilty or innocent based on something that happened outside the courtroom, if that makes any sense. Question? You talked about both the size and diversity of the judges in the Ninth Circuit. As a Montana, I'm curious what you think about the size of the Ninth Circuit. Oh, good. Up until now, Judge Tallman and I have been in agreement. He and I disagree on this one. Dick, do you want to go first or second? I'd rather rebut. Well, I'll give him plenty to rebut. The Ninth Circuit is too big only by comparison to those little boutique circuits on the East Coast that ought to be combined. Those little boutique circuits back there are too insular, too sort of hidebound, traditional, ingrown, inbred, and cross-eyed. The enormous size and diversity of this circuit contributes enormously to its quality and, in the end, its stability. Now, you want me to talk seriously? Where do I begin? Actually, now I'll say a little bit more seriously. As you watch the circuits, you sort of look at the map as you go east to west. The circuits get bigger and bigger and bigger. Two reasons for that. When they were first formed, transportation, communication was very difficult, and it was hard to have a circuit very much larger than the size that they then made them. The second reason is not quite the same. As you went west and established the circuits, if you wanted to have enough population to support a circuit, you had to have a pretty big geographical area. We've split the old fifth because it finally became big enough and enough cases and so on that they decided they wanted to split it. The Ninth Circuit is now by far the largest circuit, both in terms of geography and in terms of cases. There have been efforts to split it over the years. They have been couched often in terms of it's very difficult to administer the circuit, it's too large, it's too unwieldy. We're pretty good at administering it, actually, and technology makes it enormously useful. I don't know what they did in this circuit before the days of e-mail, for example. We can communicate with each other instantly. Sometimes too quickly. Don't push that button. Take out that last sentence. We need a seven-second delay when we hang out and broadcast. There are very different administrative problems, and I think anybody would say, and certainly I would, there comes a point at which something is too big and you want to split it up. Administratively, I don't think we're quite there yet. The motivation for splitting the circuit has been not so much administrative, although that's how the argument has been carried out, but it's been largely political and regional. Here I kind of have two minds. While I lived in California for the last 30 years, I grew up in Seattle, and I knew growing up in Seattle that we flipped. Judge Tallman now lives in Seattle. He grew up in California. I knew growing up that California was full of people who wanted nothing more than to steal the water out of the Columbia River. In fact, I still know that they do. And Southern California was trying to steal the water from Northern California. Oh, yeah. Well, I didn't know that then, but I certainly know it now. Yeah. And it's an easy sell in the Northwest to get out from under California. It was when I was a kid. It still is when I'm a kid. And there's a lot of regionalism that's going into the move to split that the Northwest should have its own circuit. That has tended to coalesce, although it need not necessarily have done so, so that it's the Republicans who want the Northwestern circuit and it's the Democrats who say no. And politically, for now, the circuit split is dead because the Republicans are simply out of power. As soon as Congress was retaken by the Democrats, politically the thing is dead. It undoubtedly will revive at some point in the future. And I have to say that at some point in the future, a split's probably inevitable. There's lots of logistical problems with the split. The major one is California because we are around two-thirds to three-quarters of the case load. So if the argument is that it's unadministerable because of the number of judges you've got, well, unless you're going to split California in half, which nobody's proposing, you're stuck with a large circuit. And to have a large circuit of California plus one state, the small states in the circuit, which is most states, I mean you've got a few with some serious population like Washington and Arizona, but there are a lot of states that may be large geographically, but tiny populations, Montana being one of them, they don't want to be the one state in the circuit with California. There's protection for those other states in that they've got, even if they've got this huge sort of 90-pound, 80-pound gorilla down here in California, they've got Arizona, Nevada, Montana, Idaho, Washington, Oregon, Alaska, Hawaii, they've got all these other states, and there's a custom, I don't think it's a statute, but there's a custom that every state gets one circuit judge, even though the case load coming out of that circuit might justify a quarter of a judge, which is, I should say it, Montana. Anyway, there it is. I have long been a supporter of the circuit split. We are now much larger than the Fifth Circuit was when it was divided and the Eleventh Circuit was carved out of it. And I've spent a lot of time talking with judges on the old Fifth Circuit, who are now on both the Eleventh and the Fifth, and it's interesting to me that the problems that ultimately convinced them that it was time to split are problems that we live with every day, not the least of which is just the size of our case load and the manageability of a coherent jurisprudence. I agree with Judge Fletcher. I tried mightily in my public statements in support of the split to argue the principles of judicial administration that I thought were at play here and why I thought we could improve the quality of our work in both circuits if we divided the Ninth, but unfortunately politics kept rearing its ugly head and arguments were couched in terms of judicial administration that were purely politically motivated. So I am hopeful that one day cooler heads will prevail, whether it's under a Republican or a Democratic regime, and people will wake up to the fact that it's now time to realign the West so that we have a little more manageable geographic and case load. I agree with Judge Fletcher. The real problem is what do you do with California? It's 70% of our case load. Last time I looked, California clearly needs more judicial resources at the court of appeals level, more judges. We are backfilling for the moment by borrowing judges from the rest of the circuit, and I spend more time down here than I do sitting in Seattle hearing cases from the Northwest. I think that the tenor of the interpersonal relations among a 50-judge court is getting to the point and you're starting to see it spill into the pages of F-3rd where we are just not being very collegial with one another, and that over time has a detrimental impact on the quality of the work that we do and on the collegial decision-making that we must engage in, and I think it is a direct correlation to the fact that we are as big as we are, and as we get bigger, it's just going to get worse. I think that there's a good chance that we're going to get an omnibus judgeship bill out of this Congress that will probably add somewhere between five and seven new judges to the Ninth Circuit that's going to bring us up to 57 or 60, not counting all our senior judges, and it's just getting to be an unmanageable size. So I'll stop at that point because I could talk about this subject forever. I'll do a quick little bubble, but not much. I don't know that the size of the circuit has much to do with collegiality or lack thereof. I've got two counterexamples. The current Sixth Circuit, those guys are just at each other's throats, and I think one of the reasons is it's the old phrase of scorpions in a bottle. There are too few of them, and they all hate each other. And the same was true in the old days of the D.C. Circuit. Those guys hated each other too. It's not been true lately, but the small circuits, oh, God, those were awful. And while we have our strains here personally on the Ninth Circuit, by and large they're managed professionally. Strain, disagreement, conflict, it's in the nature of the job. I think it's also as a result of overwork. I think that's aggravating it and making things more difficult. Yeah, maybe. I really mean I think we should have a seven-second delay on transmittable emails. It should be longer than seven seconds. Most of us, Dick Coleman and I included, are pretty nice in our emails, but there are a few of us. But, you know, if there were just three of them, they'd be saying the same thing. Yeah, they would. You're absolutely right. They are the personalities they are. Yeah, yeah. And in terms of the total judges that we have that are active judges, we've got 20, what is it, 29 active judge ships. Yeah, but then last year we borrowed 200 visiting. Oh, no, absolutely. But I'm talking not about case law. I'm talking about active judges. Active judges were 29. If we get more judge ships, it will be around five, maybe seven. But we have senior judges who stick around and they do a lot of work. Judge Nelson, for example, is a senior judge. Some people say, how can you possibly get to know your colleagues? You've got so many of them. Oh, I know them. Anyway, that's all I had to say in response. Good question. Hi, Dean. I think we should make it our next event. Our next event? Okay. Thank you. Okay, good. Yeah. I was going to ask the President, if you and I could have a disagreement. Thank you.
judges: Nelson, Fletcher, Tallman